HENRY PARRISH, PLAINTIFF IN ERROR, V. THE STATE OF NEBRASKA, DEFENDANT IN ERROR.

1. **Murder:** EVIDENCE TENDING TO LOWER GRADE OF HOMICIDE SHOULD BE SUBMITTED TO JURY. Upon a trial for murder an instruction to the jury which takes from their consideration, or which is susceptible of being understood by the jury to take from their consideration, certain evidence in the case tending to lower the grade of the homicide to manslaughter is erroneous, and in such case, the verdict being a general one and the sentence being for fifteen years in the penitentiary, the judgment will be reversed.

2. ———: VERDICT: SENTENCE. In a trial for murder a verdict of guilty which does not ascertain whether it be murder or manslaughter, as required by section 489 of the Criminal Code, confers no power on the court to pass sentence on the accused.

REHEARING of case 14 Neb., 60.

*T. Appleget & Son,* for plaintiff in error.

*William Leese, Attorney General,* for the State.

COBB, CH. J.

The plaintiff in error, together with five others, was, at the September term, 1880, of the district court of Johnson county, indicted for the murder of one Elmer E. Parker. The indictment was for murder "without deliberation and premeditation," and accordingly charged the crime of murder only in the second degree.

It appears from the supplemental record filed in this court, in pursuance to an order of the court made at the January term, 1885, that at the said September term of said district court, 1880, the plaintiff in error was placed upon his separate trial, tried, convicted, and sentenced to a term of fifteen years at hard labor in the penitentiary. Within the next ensuing year the cause was brought to this court on error. The cause was submitted to the court at the next term upon argument and brief of counsel for plaintiff in error, but went over to the next term to enable the attorney general to present a brief on the part of the state. When such brief was finally presented it called attention to the fact that the record contained no copy of either the indictment or the verdict. Yet this omission was not supplied and the opinion of the court was finally reached, affirming the judgment. The opinion is published in Vol. 14 of our reports, at pp. 60–67.

A motion for a rehearing was made and rehearing granted at the last term (Jan., 1885).

The ninth instruction given by the court on the part of the state was in the following words: "9. The jury are further instructed that if you should find from the evidence that Henry Parrish, the defendant, did kill and slay Elmer E. Parker, and no explanatory circumstances are

proven, the presumption of the law is that there was malice and that the crime is murder in the second degree."

Of this instruction the court in the opinion say: "The 9th instruction given on behalf of the prosecution was not strictly applicable, as there were explanatory circumstances respecting the killing before the jury, and had the conviction been of murder in the second degree it is possible that the giving of it would have been cause for a new trial. The error of this instruction was in its suggestion of the possible want of any circumstances, when in fact there were many of them as would lower the homicide to the grade of manslaughter. But the conviction being of manslaughter only, the error was not prejudicial and there was no cause for reversing the judgment."

It thus appears that it entirely escaped the attention of the court that the conviction of Parrish was understood and construed by the district court to be for murder in the second degree. Had reference been made to the sentence in this connection it would have been seen that the term of imprisonment imposed upon the plaintiff in error exceeded the maximum provided by law for manslaughter by five years. Section 5 of the Criminal Code provides as follows:

"Sec. 5. If any person shall unlawfully kill another without malice, either upon a sudden quarrel or unintentionally, while the slayer is in the commission of some unlawful act, every such person shall be deemed guilty of manslaughter, and upon conviction thereof shall be imprisoned in the penitentiary not more than ten years nor less than one year."

Upon the trial there were sworn and examined on the part of the state, besides the expert witnesess and the sheriff, sixteen witnesses, fourteen men and two women, all of whom had about equal opportunities of seeing and testifying to the fact and circumstances attending the homicide. It is quite within bounds to say that scarcely two

of them agree in the essential facts of the case. I transcribe the material part of the testimony of A. C. Cox, one of the said witnesses on the part of the state, given on his direct examination, as being the strongest evidence against the accused, and as illustrating the remarks of the court in that part of the opinion above quoted as "circumstances" "as would lower the homicide to the grade of manslaughter."

A. C. Cox called and sworn for the state:

Q. How long have you lived in Tecumseh?

A. It has been about fifteen years.

Q. Where were you on the 25th of June, 1880?

A. Out on the mail route during the day.

Q. What time did you get in town?

A. I don't know the exact time. I got here only by my regular time from about half-past four to five o'clock. I think about half-past four o'clock.

Q. State what you saw soon after you got back, in connection with Parker and his son?

A. The first thing I noticed of Parker he was sitting over in front of the Arcade saloon, or near there, on some rock; his son was standing near him, not far from him.

Q. Which building was that, what street was it on?

A. I cannot tell you the streets.

Q. On the west of South street?

A. It is over—

Q. How far from Blume's new building?

A. It is the one I believe that Dewey has, it was the next door from—I don't know; he was over near there.

Q. State what occurred there?

A. I saw nothing in connection that I know of, between Parker and the boy there. Then I saw a man come across the street and commence talking to Parker.

Q. Who commenced the conversation?

A. Blume.

Q. What did he say?

A.   I did not hear the first words he used; I did not hear what they were, but I heard Parker tell him to go away and let him be.   Then I heard Blume call him "a damned son of a bitch."

Q.   Who was then with Blume, if anyone?

A.   With Blume at that time?

Q.   Yes.

A.   I cannot say anyone was with him just then.

Q.   Who was near him?

A.   The crowd was gathering up all the time.

Q.   Which way did Parker go?

A.   Parker struck at Blume a lick with a cane, a walking cane, a heavy stick, and struck at him a very heavy lick, and Blume dodged it and ran into the saloon; the boy stepped up just before the lick was struck and said he wanted them to go away and let his father be; he came to take him home.   Then this Blume called him this name, and Parker struck at him.   Then I saw another man come rushing around, and the boy picked up a brickbat; I think one in each hand.   There was another man came rushing round and had some words with the boy.   I did not notice what Parker was doing, because I was noticing what the young man was doing.

Q.   Where did they go from there?

A.   They worked their way towards the Sherman House.

Q.   Where did they go from there?

A.   From there they worked towards the depot.

Q.   Where was the crowd all this time?

A.   The crowd was following them up tolerably close.

Q.   Who do you mean by them?

A.   I mean the crowd following Parker and his boy.

Q.   And they were going which way?

A.   They started east from where they first commenced, they started east toward the Sherman House and from there towards the depot, going backwards—Parker and the boy—until they got to the Sherman House, and then

the boy turned around. Parker had told him repeatedly to go home.

Q. What did the boy say to the old man?

A. The boy said to the old man—I started before them and got to the Sherman House as they first started—he said, "Father, let me alone, I can whip him." The old man said, "Elmer, I tell you to go home," and kept pushing him, for him to go home.

Q. Whereabouts did this last conversation occur?

A. What conversation do you mean?

Q. The last one, the last one you speak of between the old man and the boy.

A. When they first left the corner of the building going towards the Sherman House.

Q. Who of the crowd did you see or notice following after these parties?

A. Well, sir, I don't know as I could name them at this time. I saw Parrish near Parker, and I seen Mr. Hill; I don't know his given name, and I saw one man by the name of Jerry; I don't know his other name, and a good many other men, I don't recollect. May be more I could think of presently, but don't know now.

Q. State to the jury what Parrish was doing.

A. Parrish, from what I could see, was trying his best to get at the boy.

Q. What was he saying to the boy, and what was he doing?

A. Parrish, when I noticed him first, came up when Blume ran into the saloon, and picked up a brick and was trying to get at the boy; when I seen the boy pick up a brick, Parrish was saying something in a loud tone of voice, and I don't know whether I remember what he was saying. He was using some hard words, but I don't remember what they were.

Q. Against whom was he using the words?

A. The boy.

Q. Can you state the words?

A. I don't think I can at this time, I might at that time.

Q. State what further was done.

A. I noticed every time Parrish would work his way around the crowd the old gentleman Parker was waving his cane, telling them he would kill the first man that laid a hand on the boy's head; telling them to keep back. I heard another man—that is all I remember of Parrish trying to get at the boy.

Q. What other man?

A. I heard another man halloo for him to go ahead and whip him and he would pay the fine.

Q. Who was that man?

A. Lee Woodruff.

Q. State what further occurred.

A. I noticed the boy then going backwards towards the Sherman House, and the old gentleman talking to the crowd, and finally the old gentleman looked over his shoulder and said, "Elmer, I tell you to go home," and then the boy walked very deliberately towards the depot.

Q. Where was Parrish at this time?

A. I could not say; he was first here and then there in the crowd.

Q. Who was in advance of the crowd?

A. As near as I recollect Parrish and this young man Hill, the first time, when the boy first started, and Jerry, I think, and I don't recollect who was in advance of the crowd; I recollect I was there myself a portion of the time, a good deal of the time.

Q. State what further you saw.

A. I noticed when the boy started on down the old gentleman kept going on, and when we got just below the Sherman House I heard Jerry, from just off the sidewalk below the Sherman House and on the street, say that "it was a damned shame for a mob like that to pitch on an old

man and a boy." Henry Parrish came rushing round to where Jerry was and made as though he was going to take hold of him, and he says to Jerry, "What have you got to do with this, and do you want to take the old man's part?" He remarked again it was a shame to pitch on an old man and a boy. Jerry was whittling, or had been. Parrish cracked his hands together and said, "Put up that knife and I will whip you." Jerry remarked, "I will put up no knife, and you take damned good care not to run against that knife." My attention was attracted to that, and I did not see Parker at that time.

Q. What was the next thing you noticed in connection with this?

A. The next thing I noticed a man came rushing into that crowd and grabbed Parrish by the arm, and said, "They have got him now," or something to that effect.

Q. Whom did they have reference to?

A. I judged they had reference to Parker.

Q. State what next you noticed.

A. At that time I whirled to look down that way as soon as I could, and I saw a man just coming up on the sidewalk like as though he was coming across the street, at least he came in that direction, was in the act of getting on the sidewalk.

Q. State was else occurred.

A. At that the crowd started, when this man came into the crowd and called the attention of myself and others turned to look, and Parrish at once tore himself out of the crowd and run down to where these men were, this man I first noticed run up and struck Parker.

Q. Struck Parker?

A. Yes, sir.

Q. What was the young man doing then?

A. Young Parker?

Q. Yes.

A. He was further down the sidewalk towards the depot at that time, on ahead of Mr. Parker.

Q. What did you further in connection with him?

A. With him?

Q. The young man.

A. I saw him after they commenced pounding the old man. I saw him come running back up the sidewalk.

Q. What else occurred?

A. I saw a man hit him.

Q. State all about it?

A. I saw Blume hit Parker in the back of the head. There was another man struck Parker a lick, and then Parrish was there at that moment and hit him another lick.

Q. That was the old man?

A. Yes, sir.

Q. What was the young man doing?

A. The young man? As Parrish struck the old man the young man started and run back up the sidewalk, as Parrish struck the old man, he turned partly round and struck the young man a lick, knocking him down towards the sidewalk.

Q. What else did you see?

A. I noticed the young man throw a brick at Parrish.

Q. What else did Parrish do?

A. I saw Parrish stoop towards the sidewalk, and as he looked down to the sidewalk he made a spring towards the old gentleman, and as he did so, he reached to the sidewalk.

Q. What did he do then?

A. He picked a rock from the sidewalk and threw it at the boy.

Q. What did the rock do?

A. The rock hit the boy on the head and the boy fell down.

Q. What sized rock was it?

A. I cannot say.

Q. Would you know the rock if you saw it?

A.   I think I would, sir.

Q.  · (Handing witness rock.)   Is that the rock?

A.   (Examining rock.)   That looks very much like the rock, but in my mind I was thinking it was a little heavier, probably that may be the rock.          •

Q.   How far were you from Parrish at the time he threw the rock?

A.   I don't know.the exact distance, but I would say somewhere—probably eight or ten feet, I don't know just exactly—probably not so far.   I was standing by the fence holding to a board.   I don't recollect how far they were from the corner.

  *     *     *     *     *     *     *     *     *

An examination of the foregoing testimony, in connection with the instruction above quoted, cannot fail to show the inapplicability of the instruction to the facts of the case, nor that the jury in following the same may have rejected all of the accompanying or explanatory circumstances.   And while it is no part of my purpose to say that the evidence in the case is not sufficient to support a finding for murder in the second degree, I do say that upon the whole evidence in the case the jury would have been justified in returning a verdict for manslaughter. And when the verdict upon such evidence, as in the case at bar, is a general one, although found on an indictment for murder in the second degree, it is doing no violence to presume that the jury intended by the same to find the lowest grade of homicide included in the charge of the indictment.   The following is a copy of the verdict:

"State of Nebraska, plaintiff, v. Henry Parrish, defendant.   We the jury in this case being duly impaneled and sworn do find and say that the said defendant Henry Parrish is guilty as he stands charged.

"ROBERT BRYSON,

"*Foreman.*"

Section 489 of the Criminal Code provides, " That in all trials for murder, the jury before whom such trial is had, if they find the prisoner guilty thereof, shall ascertain in their verdict, whether it be murder in the first or second degree or manslaughter; and if such person be convicted by confession, in open court, the court shall proceed by examination of witnesses in open court to determine the degree of the crime, and shall pronounce sentence accordingly."

This section of our statute was borrowed literally from the statutes of Ohio, p. 275, § 39, Swan's Rev. Stat. And before the settlement of this state the latter statute had received an interpretation by the courts of Ohio. In the case of *Dick v. The State of Ohio*, 3 O. S. R., 89, the court, in the opinion, say : " The true object of this statutory provision is apparent. As an indictment for murder in the first degree embraces each of the three degrees of criminal homicide, of either of which the accused may be convicted, and as the issue which the jury is sworn to try, involves a charge of each of these three crimes on a general verdict of guilty, which does not ascertain the degree of the homicide, the court could render no valid judgment, not knowing from the verdict for what degree of crime the judgment should be rendered." * * * " The supreme court of Ohio held on the circuit in the case of *The State v. Town*, Wright's Rep., 75, that if the jury, in case of a trial for murder, do not specify in their verdict whether they find the accused guilty of murder in the first or second degree, or manslaughter, the court will refuse to pass sentence, and award a new trial even without a motion on the part of the defendant. And this, I believe, has been in accordance with the uniform practice in this state."

The above case has been followed by the later ones of *Parks v. The State*, Id., 101. *Robbins v. The State*, 8 O. S. R., 131. *Schoonover v. The State*, 17 O. S. R., 299, and others. See also *People v. Baza*, 53 Cal., 690. *State v. Redman*, 17 Iowa, 329.

The language of the statute is mandatory and controls all trials for murder of any degree. Without its observance the verdict confers no power on the court to pass sentence on the accused.

If this view of the law be deemed too radical, then, the jury having failed to ascertain by their verdict the degree of the crime in accordance with the spirit of our criminal laws, they must be presumed to have intended to find the lowest grade of criminality which the evidence would justify. This, as we have seen, would be manslaughter.

In no view of the case can the sentence be sustained.

The judgment of the district court is reversed, and the cause remanded for further proceedings in accordance with law.

REVERSED AND REMANDED.

MAXWELL, J., concurs.

REESE, J., dissents. *(See page* 702.)