R. W. BOURNE v. STATE OF NEBRASKA.

FILED NOVEMBER 10, 1927. No. 25852.

142

*A. C. Plantz, E. D. Crites, F. A. Crites* and *M. F. Harrington,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Lloyd Dort, contra.*

Heard before ROSE, DEAN, DAY, GOOD, THOMPSON, and EBERLY, JJ., and ELDRED, District Judge.

THOMPSON, J.

The defendant was charged in usual form, in case of death by gunshot wounds, with murder in the first degree

of Ferris C. Westervelt on the 8th day of October, 1925, in Sheridan county, to which a plea of not guilty was entered by defendant, who was not examined as a witness. Trial to a jury, and verdict returned finding defendant guilty of murder in the second degree, on which judgment was entered, and sentence imposed of imprisonment in the state penitentiary for a term of 30 years; to reverse which error is prosecuted. The claimed errors, being numerous, for sake of brevity, will be omitted, save and except as indicated in the course of this opinion.

The record reflects the following salient facts, in substance: The deceased and defendant were each between 24 and 25 years of age, were personal friends, and had been such for a number of years. The deceased resided upon a farm in Sheridan county with his parents, about 4½ miles northwest of Rushville, his usual occupation being that of a farmer or farm laborer. The defendant resided at Gordon, and at the time, and for some time prior to the incident in question, was engaged in the sale of real estate and insurance. The distance between their homes was about 25 miles. The usual route from Gordon to the home of deceased was by and through Rushville. In furtherance of their mutual interests, they desired to purchase a ranch situate over 28 miles north of Rushville, Nebraska, in Shannon county, South Dakota, and on the 7th day of October, 1925, they made arrangements to visit such land, all of which was well known to the father of deceased and other members of the family. Each of them was of limited means. This ranch stood in the name of Roy S. Ross, whose father, Ed T. Ross, had carried on negotiations with reference to the sale thereof with defendant, who was acting for both himself and the deceased, and so informed the elder Ross. In the purchase thereof they were to pay $15,-000, of which $1,500 was to be in cash, they to assume a mortgage of $7,500 on the land running 5 years, and pay the balance of $6,000 on March 1, 1926. In furtherance of this purchase, there was a meeting of the deceased and defendant on the farm of the father of deceased on Octo-

ber 7, 1925, following up a telephone conversation between the two on October 6, in which defendant agreed to come to the farm home on the morning of the 7th with his Chevrolet roadster, a one-seated automobile, having a receptacle on the back thereof. In pursuance of arrangements theretofore made, the two got into the car, in which there was a yellow horse blanket and a horsehide robe with lining, the deceased taking with him the shotgun in question, and a cartridge belt with shells. This gun, which was introduced in evidence, is a breech-loading, double-barreled shotgun, which deceased had obtained some four years previous from his uncle. Thus it was a secondhand gun, but the record does not disclose how long it had been in use prior to the time that deceased had received it. It is provided with rebounding hammers, so when either thereof is discharged, it is supposed to automatically bound back to safety; this accounting for the fact that the gun was stated to be on safety at the time defendant and deceased stopped for repairs at the Gordon garage on the night of the shooting, as hereinafter indicated. The right hammer of the gun is defective, and it was this hammer that the deceased himself had riveted and repaired, long prior to the evening in question. The defendant was without firearms, or other instruments of destruction. The two proceeded on their way to the land in South Dakota, and after having visited it, and without having contracted for the same, they returned to Gordon the evening of the same day, and deceased stayed that night at the hotel, and defendant stayed at his home with his family. The next day deceased was in Gordon, and at about 3 p. m., with defendant, was in the office of Mr. Leedom. The two had supper at defendant's home about 6:30 p. m., and left there about 7:30 p. m.; the night being cool, as testified by some of the witnesses, and cold and windy, as testified by others. They stopped at the garage in Gordon to have the lights of the automobile repaired, at some time after 7 p. m., and in fixing the lights the garage man observed the gun in the car, and asked if it was loaded, to which defendant replied that he thought

it was, and deceased was then asked, and he stated he thought it was, but, if so, it would not do any harm because it was on safety. When they left the garage at Gordon the gun was on the left side of the car, between the driver and the door, and remained there, so far as the record shows, until after their arrival at the Westervelt home. They then proceeded to Rushville, where, according to the sheriff's testimony as to defendant's statements to him, they stopped, and defendant asked deceased if he did not want to see his girl, who lived there, and deceased said it was too late. The father also testified that defendant told him they stopped at Rushville. Then they proceeded on their way to the Westervelt home. On their arrival the car was stopped in front of the gate leading to the residence, which gate was about 30 feet from the house, the usual place for stopping such vehicles. This was about 9 p. m. The father and mother had retired about 8:30 p. m., as had also their three daughters, and were each asleep at the time defendant opened and entered the front door of the house, and, in a loud voice, called out: "Come quick; Ferris is shot." No one of the family had heard any gun shots or similar noise. The father was the first to go out; the family arose, and certain of them went out to the automobile with defendant, and found the deceased lying on the ground at right angles to the car, his head almost straight in front of the gate, his feet very near, if not a little under, the left-hand running board, his right arm lying alongside his body, and the left slightly over his head; he was clothed with a heavy overcoat, under coat, vest, hat, and usual other clothing; his hat was still caught on the back of his head, and his overcoat thrown open; the horsehide robe was on the ground and the yellow blanket was in the car. Defendant and a sister of deceased carried the body into the house, laid it on the bed, at which time it was noticed that defendant's index finger on the right hand was lacerated, powdermarked, and bleeding, and from which he was suffering pain. They then telephoned for the doctor. The father had picked up the cartridge belt, which lay on the ground close

by the car, and had thrown it under the porch in front of the house. Defendant took the same car and drove to a neighbor's house with a sister of deceased to get her brother, driving along the highway until he reached a lane leading up to the neighbor's house, which he took, and on arriving there he stopped at the usual place in front of the house provided for that purpose, got the brother, and returned to the Westervelt home. The ground at and around the place where the body lay was without any indication of a scuffle, or show of blood. Neither the clothing of the deceased, nor that of the defendant, was in any manner torn, save and except there was a large hole in the overcoat around which the cloth was powder-burnt, where the shot entered near the shoulder, and on the deceased's other clothing where the shot had entered the left side. The shot which penetrated the overcoat necessarily punctured the clothing between it and the body. Undoubtedly the collar of the overcoat was raised, as the lapel of the coat covers the hole made by the shot, and such lapel was not touched either with shot or powder. There was no indication of any kind of a struggle. There was no blood on the defendant's clothing, or in, on, or around the automobile, save and except that which was found on the instrument board where the switch is; and on the gear-shifting lever; places where the operator would necessarily put his hand in running the car. The door on the left-hand side of the car was provided with a curtain, but none had been placed on the right-hand side. The doctor, on arrival about 9:30 that night, found two bullet wounds in the body and pronounced the man dead, and the undertaker was called. In the meantime the doctor had given the defendant antitoxin to prevent lockjaw, and had dressed defendant's finger. The body with the clothing on was then removed from the bed by the undertaker, and transported to Rushville, all the clothing by him removed, and later all but the overcoat burned; the body was embalmed, prepared for burial, and then interred in the cemetery at Tilden. On the removal of the body by the undertaker from the home of the father, so much of the bedding

as consisted of a pair of blankets, a feather tick, and a pillow slip, having been saturated with blood flowing from deceased's wounds, and through his clothing, including the heavy overcoat, were ordered destroyed by the family, and were taken out and burned.

As to the condition of the body of deceased when it was first viewed and examined: Dr. Broz testified that he arrived at the Westervelt home about 9:30 p. m.; examined the body; found it was warm and rigor mortis (stiffness of death) had not set in at that time; and it usually sets in from two to three hours after death; further, that the body still retained its glow, its body warmth; and hence the death must have occurred very shortly before he got there; that, after a death of this sort, the feet and hands would become cold in a very few minutes, although the body would remain warm.

Mr. Baker, the undertaker, testified that he was called about 10 p. m., and reached the Westervelt home about 11 p. m.; that rigor mortis had not set in, and the body was some warm at 11 p. m.

The father of deceased, on direct examination, testified, in substance, that he touched the right hand and face of deceased, and knew as quick as he touched him that he was dead. "There was that cold. While the body wasn't rigid, the flesh had the clammy, cold feeling to it, and his hand was cold." On cross-examination, he stated, in substance, that the body was still soft and limp; it was not warm; his face and hand were cold.

Eunice Westervelt, a sister of deceased, on direct examination testified, in substance, that she helped carry the body into the house; that she picked up the lower part and held his right hand all the way in the house; the right hand was cold; no heat at all in it. And, on cross-examination, testified, in substance, that she could not exactly say the body was limp when she helped carry it in, but it was not stiff like a board; that she laid her hand on his forehead, and it was the same then as his hand, cold.

The gun was not seen, or its whereabouts inquired into,

at the time of removing the body into the house. However, we find from the testimony of Elmer Johnson, given on the part of the state, that he was asked by Will Westervelt, the night of the death, to look for the gun when he went home, as defendant had been to Carl Johnson's that night to get Will Westervelt, and had driven into the Johnson yard and turned around therein immediately prior to starting on his return trip to the Westervelt home. This witness testified that he looked for the gun, as requested, and saw it in Carl Johnson's yard the next morning about 5:30, about 100 yards from the house; that he picked it up and laid it on the porch, after examining it; that the gun, when so found, was at the end of the lane or branch road leading from the main road to the house, and at a point where vehicles usually stopped and turned around in front of the Johnson house. He also testified that he heard some one say the night of the shooting that defendant had laid the gun on the car when he went after Will Westervelt, and it might have dropped off. And, further, that he believed he had heard Mr. Westervelt, the father, ask defendant that night where the gun was, and defendant said he thought he laid it on the back of the car.

Some months after the burial, to wit, March 12, 1926, at the request of the father, and without the defendant or those interested in his behalf having been notified, the body was exhumed and an examination thereof by a physician had, in which he described the wounds as follows: "One on the left side of the anterior axillary line, penetrating the fifth rib, passing upward and terminating at the second dorsal vertebra at the back, and going to within one inch of the skin on the back. The other one was on the right side just below the clavicle, four inches from the nipple, passing backward and inward and terminating at the second dorsal vertebra." Thus placing the wounds at their inner termination about an inch apart.

There was no eye-witness to the shooting in question, or where or when it occurred, and no evidence relating thereto except statements claimed to have been made by the defend-

ant to different witnesses examined on the part of the state, which statements are as follows:

Jeffrey Westervelt, father of deceased, testified: "Q. In the conversation you had with Wayne Bourne that night, do you remember whether or not anything was said whether he came through Rushville, he and Ferris? A. Yes, sir. * * * He said they stopped in front of the picture show down here, and one or the other of them looked at the time there, and he asked Ferris if he wanted to stop in town, and Ferris said, 'No, it was too late.'" Further: "Q. Just what did he say about how he claimed the shooting occurred? A. He told me that they were standing beside the car, Ferris and he were standing side by side at the car, and he said he didn't know which it was, whether it was he or Ferris pulled the gun from the car, and he said when the two barrels were discharged they were so close together he could hardly distinguish them from one report. * * * He told me he couldn't figure out how it could happen, because both he and Ferris spoke about it as they were coming up, that there was no loads in the gun."

Will Westervelt, a brother of deceased, testified: "He (Bourne) said they drove up in front of the house. He got out on the left-hand side of the car; my brother got out on the right-hand side of the car. He (deceased) got out and walked around that car to help take the ammunition and gun out of the car; he reached over with his left hand and took hold of the gun and pulled it out, and it was discharged. That is the way he explained it to me."

Witness Bruce, the sheriff, testified: "Q. Now, did he tell you which road they took in coming from Gordon to the Westervelt home? A. In the conversation he claimed by the highway, the way I understood it, because they came through Rushville. * * * And he brought Ferris up, and I know that Wayne said when they got to Rushville he asked Ferris if he wanted to stop and see his girl, a young lady that Ferris was going with, and Ferris said, 'No, he thought it was too late,' and they stopped down here in

front of the opera house, I think, just a minute, about the time they was speaking about the girl, and then drove on out home and drove into the yard. * * * And he said he got out from under the wheel on the left-hand side. He was driving and he got out on the left-hand side. * * * He walked around in front of the car, and just as he got in front of the car Ferris had reached in to get this gun; and he told me there was a blanket in there, and Ferris had reached in to get the gun and was pulling it towards him, and just as he was in front of the car this first shot went off, and he runs around and Ferris started to drop back, and he runs around and put his hand under his arms, and just as he got his hand under his arms the second shot went off and Ferris just dropped on back, he said. Well, he spoke about as he run his hand under his arms, holding him, at that time is when he got his finger powder-burnt, or shot, but that happened as he run his hand under his arms to hold him. And he laid him down, and he said he went in then and called Mr. Westervelt, or called the family. * * * I asked him what became of the gun, and he said he remembered picking the gun up and taking the shells out of it and laying it on the back of this car, the roadster he was driving; and I asked him what became of the gun, and he said he didn't know whether some one had taken it or whether it was lost off of the car; that he drove down to one of the Johnson's for young Westervelt. * * * I asked him what became of the shells. * * * He said he took the shells out of the gun and put them in his pocket. * * * He said later on, when he was at Gordon, he got his raincoat, or light coat, and was looking at the shells, and he burnt them."

The witness C. W. Pace testified: "Well, I don't know whether he said he was still sitting in the car or not. I understood him to say this fellow was taking the gun out by the end of the gun barrels, and they was caught in a robe in the car, and he was jerking on them and the gun went off; then he went around the car and picked him up and asked if he was hurt, and he said he didn't say anything,

just kind of made a gurgling noise in his mouth, then the gun went off again."

The witness Albert Austin testified: "He said when he stopped the car out in front of Westervelt's house that Westervelt got out and pulled the gun out towards him and the first shot went off; and he run around the car and put his hands under his arm pits and lifted him up and asked him if he was hurt, and he didn't answer him, just made a kind of gurgling sound; then the gun went off again and shot him on the right side, and that was when Mr. Bourne got the shot in the hand."

Eunice Westervelt, a sister of deceased, testified: "He told me that they drove into the yard and stopped in front of the gate; that Ferris got out first and was standing there at the car talking, just as they always did, and he went to lift the gun from the car and in doing so it caught on the robe and fired once; and he was still in the car and he seen what was the matter, so he got out as quickly as possible and went around behind the car, and he put one hand under Ferris' arm and the other above his shoulder and as the second shot was fired it shot his finger; and he laid the body down and came to the house to call mother and dad."

The state was permitted to prove that, the day following that of the death of deceased, a person, traveling the highway leading from Gordon to Rushville, observed three men standing at the side of the highway near an automobile; that near them, and in such highway, was a moist looking spot, and of a color resembling that of blood; that there were some footprints around it. The record is lacking in proof that it was blood, further than the fact of its resemblance to it, and entirely lacking in proof that it was human blood, or that the defendant was in any manner connected with it, save and except that it was on the same highway defendant said he and deceased had traveled the night before. The record does not disclose but what these two proceeded from the garage at Gordon to the home place of the father, not only unaccompanied by any other person or persons, but also without leaving the automobile.

We will first give consideration to the challenge that the court erred in its refusal to give instruction No. 13 tendered by the defendant, which covers the question of the claimed motive for the commission of the alleged crime on the part of the defendant. In this consideration, the record, and that alone, must be that which impels our conclusion.

The state sought to prove a motive on the part of the defendant, and was permitted for that purpose, over objection, to introduce evidence seeking to prove that the accused was indebted to different persons, unconnected with deceased, to the extent of several thousand of dollars, and was without funds or assets to meet the payment thereof, and had committed numerous forgeries and was by reason thereof liable to be prosecuted and convicted under our statutes for each; that to enable him to pay such indebtedness, and to cover up such forgeries, insurance on the life of Ferris Westervelt in the amount of $15,000, if he died a natural death, and $30,000, if from accidental cause or causes, payable to defendant, had been procured to be issued. To which offer of proof, and to each step leading up to and including the introduction of such evidence, proper challenge was lodged by way of objection, motion to strike, and instructions tendered. However, each and all thereof were overruled, or refused, on which error is predicated.

Does the record before us show this insurance to have been so procured or issued? It reflects: That the insurance company in question was the Old Line Insurance Company of Lincoln, Nebraska; that Dr. Broz was its local medical examiner at Rushville; that Ferris C. Westervelt, personally and unaccompanied by another, presented himself at Dr. Broz's office for examination for life insurance on June 27, 1925; that such an examination was had, and a written report thereof made by the doctor, wherein it is stated, under the amount of insurance applied for, $2,500 and $15,000. This instrument purports to have been signed in the presence of the examining physician by the deceased signing his name thereto "Ferris C. Westervelt," and is

certified to by the doctor as a part of such report after the same was completed. It was introduced in evidence, and contains the following provision: "This report is confidential and, regardless of the request of any person, must, upon completion, be forwarded to the medical department, Old Line Insurance Company, Lincoln, Nebr. The examination should be made in private. Check report for omissions. Forward promptly." The approval stamp on this report by the home office is as follows: "Approved 10 day of Aug. 1925. C. F. Chapman, Medical Director." Thus indicating that such report was to be, and was, forwarded by Dr. Broz to the home office, which, from the above, we are warranted in concluding was done. It was introduced in evidence as state's exhibit 12. There is no evidence which shows, or tends to show, that such medical report was ever in the possession of the defendant, or that he ever saw the same. Afterwards, on the 27th day of July, 1925, said Westervelt executed an application for insurance on his life in this company for the sum of $2,500, payable to his mother, with double indemnity if death was accidental, signing the same "Ferris C. Westervelt," and another application for insurance on his life in the sum of $15,000, payable to his estate, with double indemnity in case death resulted from accidental cause or causes, and signed this application "Ferris C. Westervelt." These applications were afterwards by the defendant, who at the time was a subagent of the company under one Frank L. O'Rourk, who was the general agent thereof at that place, to wit, Gordon, delivered to O'Rourk, and he forwarded each thereof to the home office of the company at Lincoln, which office, after due consideration of the medical examiner's report, and the applications, issued two policies, one for $2,500 payable as above indicated to the mother of the deceased, and the other for $15,000 to the estate of Ferris C. Westervelt. These policies were transmitted by the company to its general agent O'Rourk at Gordon, and by him received August 12, 1925, and by him placed in a safe in the office of the defendant, together with a directory com-

munication from the company to O'Rourk as to the delivery of the policies, and the execution of a blank assignment accompanying the same; which safe, however, while being that of the defendant, was used, as was the office in which it was situate, by both O'Rourk and the defendant, and each had equal access thereto, and control thereof, as well as of the things placed therein. Such applications for insurance were on printed blanks in usual form and were each, as completed, introduced at the trial, the $2,500 one being state's exhibit 11, and the $15,000 one being state's exhibit 10. As to the policies, the state offered to introduce in evidence certified copies thereof, to which respectively the defendant objected as not being the best evidence, and no proper foundation laid for their introduction, which objections were sustained. While these policies were called for at different times on the part of the defense, and at the time objections were lodged as to the introduction of certified copies thereof, they were never introduced in evidence, notwithstanding the fact that such introduction was promised at each of these times on the part of the state, and notwithstanding they were each admitted to be at the time in the possession and under the control of the company, whose representative was the state's witness at the trial and testified that he could, and would, produce the original policies. Neither was the directory communication accompanying the policies at the time they were delivered to O'Rourk introduced in evidence, nor the blank assignment included therewith, notwithstanding a promise on the part of the state at different times during the trial that it could, and would, produce them before the close thereof. Hence, the trial court, including the jury, as well as this court, is denied an inspection of either. The signatures "Ferris C. Westervelt," forming a part of the medical report, and attached to each of the respective applications, are identical in form, even when viewed through a magnifying glass, or as near so as is usual in signatures, and withstand the test of comparison as to their genuineness. No one testifies, and neither are they asked, as to whether

or not in their opinion such signatures or either thereof is, or is not, that of such Westervelt. Certainly the burden of proving the forgery of the application in question, as well as the fact that the $15,000 appearing in the medical examiner's report was not therein at the time it was signed and executed, and further that the $15,000 was written in such report by the defendant, was at all times on the state, and this being a criminal action, such proof must be convincing beyond a reasonable doubt. This burden was not met, and must have been so assumed by the trial court, as the record is without an instruction to the jury as to the law applicable to the comparison of handwriting, and this, notwithstanding the fact that it is admitted all through the trial that the name attached to the application for the $2,500 policy is the genuine signature of Ferris C. Westervelt, the deceased, and, as above indicated, the record is without evidence to the contrary as to either of the other two signatures. If the state claims that this question was material, then it was a material part of its case, and by reason thereof the law applicable thereto became a part of the law of the case, and it was the duty of the court, with or without request, to instruct the jury in reference thereto, and its failure so to do was prejudicially erroneous. However, as above indicated, we conclude that each of the signatures so attached to such respective instruments is the genuine signature of Ferris C. Westervelt. We are confirmed further in the above conclusion by the statement of the mother, that the deceased son had informed her of the insurance taken out in her favor, but did not inform her of the amount of the insurance, and later she asked and was told by the doctor that the amount was $2,500 and this was while the son was still living. She further testified: "Q. Did he tell you who he had the insurance with? A. Well, I knew who wrote the policy; in that way I knew what the policy was, because our other boy had a policy in the same company. * * * Q. And written by this same Gordon agency? A. I supposed it was." The father also testified that the mother had told him of this $2,500 policy,

all of which happened prior to the death of the son. The mother testified further that she learned of the $15,000 policy when the note given to pay the premium for it was sent to the home by the insurance company for collection. Further, the witness Leedom, on the part of the state, testified that defendant and deceased were in his office at Gordon about 3 p. m. of the day in question, and the witness, not being very well acquainted with deceased, told him to look out or defendant would load him up with life insurance like he had done some of the rest, and deceased stated that he would bet a nickel he had more insurance than Leedom had, and Leedom told them then that he, Leedom, was worth more dead than alive.

It is true that in the $15,000 application, being state's exhibit 10, as introduced in evidence, it is stated that it is for the benefit of "Estate." and just below this word there had been at one time written in the words "creditors and partner," but through the words "creditors and partner" a line had been run apparently canceling such words. There is also in paragraph 8 of the application for $15,000 the following words, in print, "I hereby request," which are followed by the words, "Beneficiaries. Roy S. Ross to extent of indebtedness to him. Bal. to partner R. W. Bourne." This clause is undoubtedly what gave rise to the directory communication accompanying the policies as they were mailed to O'Rourk, and this we conclude also gave rise to the blank assignment accompanying such policies. While neither the assignment, nor the communication, was introduced at the trial, we have in the record the following evidence: The state's witness Frank O'Rourk, on cross-examination, testified that the two policies, together with a directory communication and a blank assignment, came to him on August 12, 1925, from the home office of the insurance company, and he put the same in the safe in the office, to which he and defendant had equal access; that he told the defendant of receiving the policies, the letter and the blank assignment from the home office, and further: "I told him that when he saw Westervelt to tell him the policies were here,

and there were assignments that would have to be signed up on the big policy before it could be delivered. * * * That the company refused to issue the policy as applied for, payable to Mr. Bourne and Mr. Ross, and had made it payable to the estate of Ferris Westervelt, and it would be necessary to have an assignment signed by Mr. Westervelt, showing the amount to Mr. Bourne and to Mr. Ross." That is, the amount payable, if any, to each. And he further testified that such assignment had never been executed or signed by Ferris C. Westervelt.

It will be noticed that this information was conveyed to the defendant nearly two months before the incident in question took place, and from that time on defendant was possessed of full knowledge and could not have but realized that, if Westervelt should die, such insurance of $2,500 would go to the mother, and the $15,000 to the estate of Ferris C. Westervelt, and not to him. Such determination is strengthened by the record, which further shows that shortly after the burial of Westervelt, to wit, November 2, 1925, the father filed an application for the appointment of Bourne as administrator, and, as he says, he did so at the request of defendant. In this application the father stated that the estimated value of the personal property of deceased was the sum of $2,500, or thereabouts. There is in the evidence testimony of the father indicating that he knew of the $15,000 policy both before and after he filed his application for the appointment of Bourne as administrator; that the defendant never laid claim to such $15,000, and later, at the instance of the father, testified that he had no interest in the policy, and never claimed any interest therein. On November 30, 1925, defendant was appointed, and qualified and entered upon the discharge of his duties; and on the same day he filed an inventory of the estate, in which he stated that the personal property coming into his hands was an "insurance policy in the Old Line Insurance Company of Lincoln, Nebraska, with double indemnity clause in case of accidental death, in the sum of five thousand dollars, $5,000." On this same day, to wit, November 30, 1925,

a meeting was had, at which defendant, as administrator, the father and mother of deceased, and the insurance company, by its president, were present, and an adjustment was had, which was reduced to writing, and signed by the mother, the administrator, and the company, and received as evidence on the part of the state at the trial, wherein we find: "Whereas, Mildred Westervelt claims that a certain policy of insurance in the sum of $2,500, policy numbered 20891, was issued upon the life of Ferris C. Westervelt, by the Old Line Insurance Company, payable to said Mildred Westervelt, upon which policy the Old Line Insurance Company denies any and all liability; and, whereas, R. W. Bourne is the administrator of the estate of Ferris C. Westervelt, deceased, and claims that a certain policy of insurance in the sum of $15,000, policy numbered 20892, was issued upon the life of Ferris C. Westervelt by the Old Line Insurance Company, payable to the estate of said Ferris C. Westervelt, upon which policy the insurance company denies any and all liability." This agreement of settlement also shows that it was the desire of all parties to settle completely and finally all matters in reference to such claims, and it was therefore mutually agreed that $5,000 should be paid by the company to Mildred Westervelt and R. W. Bourne, administrator, and the company should be released, and in furtherance thereof the $5,000 was paid to the mother and by her retained, and the two insurance policies turned over to the president of the company. The record is without evidence showing that at the time of this settlement, to wit, November 30, 1925, there was even any suspicion that defendant was guilty as charged in the complaint in this instant case, or otherwise. The court appointing Bourne as administrator, being informed of such settlement, was dissatisfied therewith, and, upon Bourne filing his resignation as such administrator on January 12, 1926, the same was accepted and he was discharged; and on February 1, 1926, the father was appointed in his stead. Afterwards, and before complaint was filed against this defendant, the father, as administrator of the estate of the deceased son, instituted an ac-

tion on the $15,000 policy seeking to recover under the accidental clause thereof the sum of $30,000; and settlement between the parties was had of such action. The amount received by such administrator by reason of the settlement is not disclosed. On March 2, 1926, the defendant filed his report as administrator, in which is shown his expenditures, including his attorney fees paid out.

Therefore, as before concluded, it is clear that the defendant was without interest in the policy for $15,000, and could in no manner benefit by Westervelt's death, which fact he was cognizant of long prior, up to, and at the time of the death of deceased. Thus, from what has been said herein in reference to the $15,000 policy forming a basis of a motive for the act charged, it follows that the state failed in its proof of a basis for such claimed motive, and, having so failed on a point so vital, prejudicial error was committed by the trial court in refusing to give instruction No. 13, offered by the defendant, which reads as follows: "The jury are instructed that the state claims and has offered evidence in support of the claim to the effect that the motive for the alleged offense was an attempt on the part of the defendant to insure the life of the said Ferris Westervelt in favor of the defendant, or in such manner that the defendant could profit thereby. With reference to such claim, the jury are instructed that the state has proved that at the time of the death of the said Ferris Westervelt there was no insurance on his life in favor of the defendant, and that the defendant had no interest in any of said insurance at the time of the death of said Ferris Westervelt, which facts the defendant well knew at and more than a month prior to the death of the said Westervelt, and that therefore the state has failed to support its claim of such motive, and all evidence on that topic is hereby withdrawn from the jury and said jury are instructed to disregard the same." We might state further that no instruction was given which cured this error.

At the trial the defendant tendered, and the court refused, the following instruction: "The jury are instructed

that evidence has been introduced tending to show that the defendant made certain admissions of statements appearing in evidence. Verbal statements or admissions should be received by you with great caution, as they are subject to much imperfection and mistake, owing to the person speaking not having clearly expressed his own meaning, or the person spoken to not having clearly understood the speaker. It frequently happens, also, that the witness, by unintentionally altering a few words or expressions really used, gives an effect to the statement entirely at variance with what the speaker actually did say. In this connection the jury should bear in mind the infirmity of memory and that the mind of the prisoner himself is often oppressed by the calamity of the situation, and that he is sometimes influenced by motive of hope or fear to make statements."

The weight to be given such statements when received in evidence in any trial is quite material, but much more so in a case like this, where there are so few illuminating facts. It is quite elementary that, while such evidence is competent, it has its imperfections, as has been recognized by our courts and text-writers for many generations. In Greenleaf, Evidence (16th ed.) sec. 200, we find:

"With respect to all *verbal admissions,* it may be observed that they ought to be received with great caution. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself either being misinformed; or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say."

In *Cooper v. Skeel,* 14 Ia. 578, 581, the thought here presented is cogently expressed in the course of the opinion, wherein it is said: "Than this no species of testimony is more dangerous, or received with greater caution." While this statement was made in a civil case, it certainly should

not, and does not, lose any of its forcefulness when applied to a criminal prosecution.

It is well said in 22 C. J. 289, sec. 318: "It is a common experience of those dealing with human testimony that conversations are very imperfectly remembered, particularly where the exact language used is sought to be recalled after a considerable lapse of time." In support of this statement numerous cases of courts of last resort are collated and cited in the note under the text.

This court early adopted the rule above indicated as evidenced in our opinion in *Milton v. State*, 6 Neb. 136, 139, wherein we say: "In *State v. Gardiner*, Wright's Rep. (Ohio) 399, the court, in instructing the jury, say: 'The design or purpose to kill, may be deduced from the attending circumstances; the manner of inflicting the wounds; the kind of instrument with which they are inflicted, and its natural tendency to destroy life. It may be deduced also from the declarations of the prisoner made at the time, or before, or after the deed was done; but where reliance is placed on declarations, a jury should receive them with great caution.' See, also, *State v. Thompson*, Wright's Rep. (Ohio) 623." In the *State v. Gardiner* case, from which we adopted the conclusion as above quoted, the text of the opinion is as follows (page 400): "But where reliance is placed on declarations, a jury should receive them with great caution and scrutinize with care the circumstances under which they were uttered. Declarations made while a prisoner is agitated or depressed, are to be regarded but slightly. They are often made without thought or intention; are heard imperfectly, inaccurately remembered, and carelessly detailed. There is danger that the witness may substitute words of his own for those of the prisoner, and by the employment of his own language, in whole or in part, convey to the mind of the hearer, ideas the prisoner never thought of." Citing *State v. Thompson, supra,* in which language almost identical is used.

While the last two above cited cases were those of a *nisi prius* court, they were approved by the supreme court of

that state (Ohio), as indicated in *Milton v. State, supra,* at page 140. Without question they correctly state the law applicable to such declarations, and care should be taken by the trial court in so informing the jury, and in a way not to weaken its force by omission or condensation. The unreliableness of such evidence, as expressed by Greenleaf, and reaffirmed by us, is reiterated and strengthened, not only in the text, but also by citations in 4 Wigmore, Evidence (2d ed.) 464, and that which follows therein on the subject.

That the foregoing is the law applicable to the instant case is not seriously questioned on the part of the state. However, it claims that error in such refusal to instruct was cured by an instruction given by the court on its own motion. This instruction omits so many of the material features of the instruction tendered as to make it impossible for us, under this record, to hold that such failure did not prejudicially affect the defendant's case.

As there was no eye-witness to the shooting in question, the degree of guilt, if any such is proved, must necessarily be determined largely from the circumstances surrounding the transaction as detailed in evidence. With this thought in view, the defendant asked that the court instruct the jury as to manslaughter, in addition to the charge given as to murder in the first degree, and murder in the second degree, which the court refused. This refusal is also presented as error. Our statute on this subject (Comp. St. 1922, sec. 10155) provides in part: "In all trials for murder the jury before whom such trial is had, if they find the prisoner guilty thereof, shall ascertain in their verdict whether it be murder in the first or second degree, or manslaughter." We have uniformly held that such statute is mandatory. *Parrish v. State,* 18 Neb. 405. The case of *Russell v. State,* 66 Neb. 497, is one directly in point, as to the fact that it was buttressed as to proof largely on facts and circumstances surrounding the felonious homicide charged. The court instructed the jury as to the three degrees of murder. It was held that it did not err in so

doing. In the second paragraph of the syllabi, in construing that which is the section of our statute here under consideration, we said: "By section 489 of the Criminal Code the jury are required, in trials for murder, to declare in their verdict whether the accused, if they find him guilty, is guilty of murder in the first or second degree, or manslaughter."

In *Kraus v. State*, 102 Neb. 690, defendant complained "because the jury was not instructed respecting any degree of homicide save only as to murder in the first degree." A challenge was lodged to this instruction, as in the instant case, which was sustained and the trial court reversed; and, in the course of the opinion, at page 694, we said: "The rule in this country is almost universal that in a case charging first degree murder it is the duty of the court to instruct respecting all of the inferior degrees of homicide to which the evidence is properly applicable, even though such instructions are not requested."

In the instant case, as there was no eye-witness, and the evidence was largely circumstantial, it was error not to instruct as to the law inherent in the crime of manslaughter.

We are sustained also in this conclusion by the following authorities: *Rutherford v. Commonwealth,* 13 Bush (Ky.) 608, wherein it was held: "When no witness saw the homicide committed, or the parties on the occasion when the killing occurred, the law applicable to murder, manslaughter, and self-defense should be given in order to meet any state of fact the jury may find, from the circumstances in evidence, to have existed." The above holding is sustained by *Brown v. Commonwealth,* 117 Ky. 766, and *Stanley and Nix v. Commonwealth,* 184 Ky. 237.

In *Jones v. State,* 13 Ala. App. 10, 26, it was held: "Where the evidence is wholly circumstantial, and the character of the weapon, the circumstances attending the homicide, and the motive therefor rest in inferences to be drawn by the jury from the circumstances proved, the court should give in charge to the jury the law on all degrees of intentional

homicide." To the same effect are *Aguilar v. Territory of New Mexico,* 8 N. M. 496, 507, and *State v. Crockett,* 39 Or. 76.

In this, we in no manner run counter to our holdings in *Rhea v. State,* 63 Neb. 461, *Simmons v. State,* 111 Neb. 644, or *Davis v. State, ante,* p. 90.

This opinion is now of too great length, and hence we will not extend it further with a discussion of the other alleged errors complained of, but simply state that they have each received due consideration. Notwithstanding this. it must be remembered that the defendant is clothed with the presumption of innocence which stands as evidence in his favor, and that this presumption remains until the state by its proof shows him to be guilty beyond a reasonable doubt; that the burden of furnishing such proof is with the prosecution throughout the trial, and never shifts; that if the evidence or any material part thereof is fairly susceptible of two constructions, one in favor of the state and the other in favor of the defendant, the doubt must be resolved in behalf of the innocence of the accused, as every intendment or inference under the evidence, considered in its entirety, must be construed in defendant's favor; and that it is the duty of the court and the duty of the prosecuting attorney, whether he be one elected or one selected by the court, to endeavor to surround the trial with an atmosphere of fairness toward the defendant, and one not disturbed by prejudice, passion or ill will, as far as each can reasonably do so. With these thoughts in view, we cannot say that this record, taken as a whole, is persuasive as to the guilt of the defendant. *Casey v. State,* 20 Neb. 138; *Lowe v. State,* 110 Neb. 325. However, as the judgment of the trial court must be reversed, and the case may be retried, we refrain from further comment.

REVERSED AND REMANDED.